**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-240 (JEB)** |
| **v.** | : | |
| | : | |
| **ERIC GLEN HARROWER,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Eric Glen Harrower to thirty-six months' probation with a condition of 14 days of intermittent confinement. The government also requests that this Court impose 60 hours of community service, a $10 special assessment, and, consistent with the plea agreement in this case, $500 in restitution.

The government does not oppose scheduling Harrower's confinement in a manner that would allow him to work. For example, he could serve his sentence on weekends. This sentence would put Harrower on similar footing as Joshua Dressel, his friend and travel companion on January 6. Joshua Dressel pleaded guilty to 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building) on August 18, 2022.  On March 22, 2023, Dressel was sentenced to a 14-day imprisonment term, a $500 fine, and $500 in restitution. *See U.S. v. Joshua Dressel*, 21-CR-572 (CRC).

## I.      Introduction

Defendant Eric Glen Harrower, a 35-year-old foreman for a tree trimming company, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Harrower pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, Or Picketing In Any Capitol Building). The government's recommendation is supported because Harrower: (1) observed chaos on the Capitol grounds and watched other rioters attack police; (2) sat atop an approximately ten-foot high banister of the Northwest Stairs that led to the Upper West Terrace and the Capitol building; (3) helped other rioters, from his spot on that banister, climb up overturned bike racks to the top of the banister thereby fueling the mob and providing it with the manpower needed to breach a police line further up the stairs; (4) after the police line broke, ascended to the Upper West Terrace outside of the Senate Wing Doors, the site of one of the most consequential breaches of the Capitol, and entered the doors approximately two minutes after the doors had been breached; and (5) remained in the Capitol  Building for 22 minutes.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The Court must also consider that Harrower's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Harrower's crime support a sentence of 14 days of intermittent confinement rather than just probation.

**II.      Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 at 1-3.

*Defendant Harrower's Role in the January 6, 2021 Attack on the Capitol*

Harrower and his friend Joshua Dressel drove to the Washington, D.C. area on January 5, 2021, to attend the Stop the Steal Rally the following day. They stayed in a hotel in and spent the day in Washington, D.C. sightseeing.

On January 6, 2021, Harrower, along with Dressel, went to a field near the Washington Monument, heard some of the former president's speech and went along with the mob to the Capitol. As they got closer to the Capitol, they could hear flashbangs and see what they thought was tear gas. They witnessed rioters that had been pepper sprayed and claimed to have been shot with pepper ball rounds. There was a lot of chaos in front of the Capitol. Nonetheless, Harrower and Dressel continued onward to, and eventually arrived at, the Capitol.

At the Capitol Grounds, rioters toppled barricades that consisted of metal bike racks, physically linked end to end. Scaffolding for the upcoming presidential inauguration was erected

over a staircase--the Northwest Stairs that led to the building's Upper West Terrace. Alongside the staircase and scaffolding was a banister that was approximately ten feet tall.

Upon arriving on Capitol Grounds, Harrower made his way to the Northwest Stairs and climbed to the top of the ten-foot banister. He took a position with a group of rioters at the vanguard of the mob, right near police.  While there, he held an overturned bike rack so that other rioters could—and did—use it as a ladder to climb the banister and access the Stairs. Ex 1. at 5:33-6:20; Ex. 2 at 2:39-2:50. In addition to holding the rack, he waved other rioters toward the stairs— appearing to encourage them to join him there. Ex. 1 at 3:11-3:45. Police attempted to keep the rioters away from the building. However, at about 2:09 p.m., when the mob on the steps reached critical mass, it was able to overwhelm the officers higher up on the steps. Accordingly, Harrower fueled the manpower of the mob, of which he was a willing participant, and enabled the mayhem it caused.

 

| | |
|---|---|
| Image 1(Screenshot from Ex. 3 at 1:30): *Harrower and Dressel manned the bike rack. Harrower is in the maroon hoodie, circled in yellow, while Dressel is in the blue hoodie and backwards ballcap.* | Image 2: (Screenshot from Ex. 3 at 0:27) *Harrower admitted holding the bike rack to help rioters climb the banister; a rioter with flag stand who would later begin striking the masonry is seen in the foreground of the picture.* |



Image 3 (Screenshot from Ex. 2 at 2:42): *Harrower helped a rioter climb the banister.*



Image 4 (Screenshot from Ex. 1 at 1:23): *Screenshot showing Harrower's position relative to police officers guarding the Northwest Stairs and the Building.*



Image 5: *Rioters overwhelm officers near the top of the Northwest Steps. Harrower was at the bottom of the Northwest Stairs helping rioters climb up the steps. His actions fueled the manpower of the mob on the steps. That manpower allowed the mob to overwhelm police.*

As Harrower helped rioters scale the banister along the Northwest Stairs, a rioter standing next to him shouted "Fuck DC PD!" Ex. 3 at 1:30-1:40. Shortly thereafter, the camera pans to a

group of police officers in riot gear struggling to move as the mob attacked them. *Id*. at 1:40-2:13.

Harrower would have had a clear view of these events from his position on the banister. *Id*. at

1:30-2:13.



Image 6 (Screenshot from Ex. 3 at 1:59): *Rioters attacked and surrounded police near where Harrower helped rioters climb the banister.*

Despite what he had seen as he approached the building and from his position on the banister of the Northwest Stairs, Harrower proceeded upward toward the West Plaza, using the scaffolding to aid him in his advance toward the Capitol Building.



Image 7: *Harrower using the scaffolding to get to the West Plaza.*

After going up to the West Plaza, Harrower stopped to take a water bottle and then made his way toward the Senate Wing Doors.  While there, and as the crowd finished chanting, "Fight for Trump!,"  Harrower and Dressel wrapped their arms around each other's backs and patted their shoulders as if to congratulate themselves. Approximately 29 seconds later, the crowd in front of the Senate Wing Doors began to shout repeatedly, "Let us in!"



Image 8: *Harrower with his arm around Dressel's back near the Senate Wing Doors on the West Plaza. Harrower's head is circled in yellow. His hand is on Dressel's shoulder in the left of the frame and the maroon sleeve of Harrower's sweatshirt is also visible at that location.*

Harrower was among the first group of rioters to enter the Capitol Building. Surveillance video revealed that Harrower entered through the Senate Wing Doors at approximately 2:14 p.m. He came into the Capitol Crypt through the north corridor, remaining in the Crypt area from at least approximately 2:25 through approximately 2:34 p.m. In the Crypt, the mob was raucous and loud. During this time, Harrower would have been able to witness a member of the mob throw a fire extinguisher at police officers.



*Harrower while the fire extinguisher was in midair, hurtling toward the officers that protected the Capitol. Harrower is circled in yellow and the fire extinguisher is circled in green.*

At approximately 2:33 p.m. in the Crypt, Harrower again embraced Dressel—presumably in celebration.



*Harrower, circled in yellow, and Dressel hugging one another in the Crypt.*

Harrower exited though a broken window near the Senate Wing doors at about 2:36 p.m. Harrower said that, once out of the Capitol building, he and Dressel left the Capitol grounds, returned to the hotel to gather their belongings, and left the D.C. area in the late afternoon or early evening of January 6, 2021.

*Defendant's Interview*

Harrower volunteered to speak with the FBI after Dressel had been charged, but before he (Harrower) was charged. During the interview, Harrower was shown four printed pictures of himself in the Capitol. He signed and dated the pictures, acknowledging that the individual in the pictures was him. After being charged, Harrower again spoke with the FBI.

In both interviews, his recounting of the day's events was generally consistent with what video showed. Harrower admitted that he went to the Capitol to join others who believed the elections results were not valid, and he wanted to have his voice heard. He was aware that the Vice

President had "backed out of something," but claimed that he was unaware of what VP Pence had backed out of.

Although Harrower expressed that he wanted to accept responsibility, he downplayed his conduct. Instead of simply admitting to helping members of the mob access the Stairs, he asserted that he used the bike rack as a ladder because he was concerned for the safety of the rioters climbing the wall. He claimed that he decided to go into the Capitol Building because he did not want to leave Dressel alone. Harrower further asserted that he helped calm people down and pick up trash, but the reviewed video evidence does not show him doing so.[2] He could not explain why he ignored tear gas, flash bangs, fences and other security measures, and violence against the police, as he pressed onward into and throughout the Capitol on January 6, except to say he was likely "in the moment."

*The Charges and Plea Agreement*

On July 24, 2023, the United States charged Harrower by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 17, 2023 pursuant to a plea agreement, Harrower pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Harrower now faces sentencing for violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Harrower faces up to six months of imprisonment

---

[2] The footage uncovered in the investigation reveals Dressel, not Harrower, picking up discarded water bottles. Additionally, Dressel, not Harrower, may have addressed other rioters at various times in the Capitol Building, though it is unclear if Dressel was acting to calm them.

and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of thirty-six months' probation with a condition of 14 days intermittent confinement, 60 hours of community service, a $10 special assessment, and, consistent with the plea agreement in this case, $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Harrower's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Harrower, the absence of violent or destructive acts is not a mitigating factor. Had Harrower engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Harrower's case was his using a bike rack as a ladder to help rioters scale a wall and gain access to the Northwest Stairs. Once on the Stairs, rioters overwhelmed the police further up the steps and, later, broke into the Capitol Building. Harrower

fueled the manpower of the mob, but when interviewed he claimed that he used the bike rack as a ladder because he was concerned for the safety of the rioters climbing the wall. This statement minimizes his conduct and shows a lack of remorse.

Harrower's minimization did not end there. He claimed to help calm people down and pick up trash, but the reviewed footage shows no evidence of his doing so. Instead, video shows Harrower embraced Dressel *twice* as chaos and violence, the very chaos and violence which Harrower fueled as a member of the mob, swirled around them. He was among the first group of rioters to break into the building, and he spent 22 minutes there before exiting.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of thirty-six months' probation with a condition of 14 days of intermittent confinement in this matter.

### B. Harrower's History and Characteristics

As set forth in the PSR, Harrower has no criminal history. ECF 25 ¶¶ 33-39. Harrower has no mental health or substance abuse issues and has worked as a foreman in the tree trimming business for 20 years. *Id.* at ¶¶  51-58. His current employer is aware of his offense, and his conviction will not result in loss of employment. *Id.* at ¶ 59. Harrower is the father of four young children. *Id.* at ¶ 45. The government's recommended sentence of probation with intermittent confinement properly balances his family circumstances and the need for punishment.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of probation with a condition of home detention. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in

a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in nearly every case arising out of the violent riot at the Capitol. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. *See United States v. Cynthia Ballenger and Christoper Price*, 1:21-cr-719 (JEB), Tr. At 54 ("Donald Trump lost the election to Joe Biden. And yet on January 6, a mob of people bent on undoing that election gathered in Washington and ultimately stormed the Capitol in what I have called and continue to call an insurrection, an attempt to install and empower the person who had lost at the ballot box.").

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of intermittent confinement. Harrower did not personally assault police or destroy property, but that does not lessen the need for specific deterrence here. As this Court has recognized regarding January 6 defendants who did not personally attack officers or

15

damage property,

> while […] you didn't assault anyone, you didn't destroy anyone, you didn't steal anything, you were part of that mob. And a mob is only a mob if it has numbers. If it is three people or five people or seven or fifty, they don't get anywhere because the Capitol Police is able to resist them.

*United States v. Cynthia Ballenger and Christoper Price*, 1:21-cr-719 (JEB), Tr. At 54. And Harrower did not merely enter the Capitol Building himself. Rather, Harrower acted intentionally to strengthen the mob by helping rioters on the Northwest Stairs scale the banister until the beleaguered officers could no longer hold off the angry throngs.  If the numbers of rioters had remained manageable, the police line further up the Northwest Stairs would have held. The obvious consequence of his actions and those of his fellow rioters was to overwhelm that police line. For Harrower's role at the Northwest Stairs, a significant sentence of intermittent confinement is necessary and appropriate.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Harrower based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Harrower has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The case most like Harrower's is that of his companion, Joshua Dressel. Their conduct was generally the same. In *U.S. v. Joshua Dressel*, 21-CR-572 (CRC), Judge Cooper imposed a sentence of 14 days of incarceration, $500 in restitution, and a $500 fine.  Despite stable family background and responsibilities to his young children, Harrower, like Dressel, fueled the strength of the mob. Probation would keep Harrower from again behaving criminally in the upcoming presidential election. The addition of intermittent confinement would deter Harrower and others like him from engaging in similar conduct and would also reflect the seriousness of his conduct.

In *United States v. Caleb Jones* 21-CR-321 (JEB), this Court fashioned a sentence similar to the one the government requests here. Jones had scaled a wall, entered the Capitol Building through the Senate Wing Doors, and spent about 15 minutes in the Capitol. This Court sentenced Jones to 24 months' probation, 2 months of home detention, 100 hours of community service, and

$500 in restitution. Harrower helped other rioters scale a wall using a bike rack, so the longer period of probation and the addition of 14 days of intermittent confinement, as opposed to home detention, is proper for him.

## V.     Intermittent Confinement as a Condition of Probation

As a condition of probation, a court may order that the defendant be incarcerated "during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(1); *see also United States v. Little*, 78 F.4th 453, 461 n.7 (D.C. Cir. 2023) (section 3563(b)(1) "contemplates *short* periods of confinement like 'nights' and 'weekends' interspersed throughout probation"). The statute was designed to give courts flexibility in the "fashioning of conditions of probation in order to make probation a useful alternative to a term of imprisonment." S. Rep. No. 98-225, at 59 (1983). Because Harrower has pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G), a second-degree misdemeanor, the statutory maximum of total confinement the Court may impose under § 3563(b)(10) is six months.

Judges in this district have imposed intermittent confinement as a condition of probation in many January 6 cases. *See*, *e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30 days of confinement in three-day intervals as condition of three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42 days of confinement in 14-day intervals as condition of three years of probation). While the statute refers to multiple intervals, a single short interval is also permissible. *See*, *e.g.*, *United States v. Valentin*, 21-cr-702 (JEB), ECF No. 65 (D.D.C. July 17, 2023) (imposing single 10-day interval of confinement as condition of 12 months of probation); *United States v. Escalera*, No. 22-cr-364 (APM), ECF No. 36 (D.D.C. Aug. 8, 2023) (imposing single seven-day interval as

condition of two years of probation); *see also* S. Rep. No. 98-225, at 99 (noting that statute was intended to permit a single "brief period of confinement").

Here, a condition of intermittent confinement totaling 14 days is sufficient, but not greater than necessary, to serve the purposes of sentencing under 18 U.S.C. § 3553(a)(2).

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Harrower must pay $500 in restitution, which reflects in part the role Harrower played in the riot on January 6.[5] Plea Agreement at ¶ 11. As the plea agreement

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for

reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Harrower's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 87.

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to thirty-six months' probation with a condition of 14 days of intermittent confinement, 60 hours of community service, a $10 special assessment, and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Harrower's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ Joshua Ontell
JOSHUA ONTELL
VA Bar No. 92444
Assistant United States Attorney
601 D Street, N.W.
Washington, DC 20530
(202) 252-7706
joshua.ontell@usdoj.gov

---

purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).