**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-240 (JEB)** |
| **ERIC GLEN HARROWER** | |

### MR. HARROWER'S MEMORANDUM IN AID OF SENTENCING

Mr. Eric Harrower will be before the Court for sentencing on April 9, 2024, having accepted responsibility for his conduct at the U.S. Capitol on January 6, 2021 and having successfully completed nine months of pretrial supervision. On January 6, 2021, Mr. Harrower came to Washington, D.C. to support President Trump, who told his followers on that day that the election results were incorrect, that this created a national security threat, and that his supporters should go to the Capitol to urge Senators and Vice President Mike Pence to take what he described as lawful steps provided for under the Constitution to correct the election results. Mr. Harrower traveled with the crowd from President Trump's Stop the Steal rally to the U.S. Capitol. He entered the building and remained inside for just over 20 minutes. While in the building, he did not engage in any violence, he did not taunt or insult police, he did not damage property, he did not encourage others to engage in violence, and he did not celebrate violence.

Mr. Harrower is 35 years old, a loving husband, a father of four young children, and a hard worker with a stable job. His decision to attend the Stop the Steal rally and to enter the U.S. Capitol building on January 6, 2021, does not accurately

represent Mr. Harrower's character. That is perhaps most clearly demonstrated by the fact that Mr. Harrower made himself known to the FBI as one of the individuals involved in the events of January 6, 2021 and spoke voluntarily with the FBI about his involvement. In addition, in the more than three years since the offense conduct underlying Mr. Harrower's conviction in this case, he has not been rearrested; he has welcomed a new child; he has held down a stable job; he has moved closer to family and a positive support system; and he has committed to never make this kind of mistake again. For these and all of the reasons stated below, a sentence of 12 months' probation with community service and $500 in restitution is sufficient, but not greater than necessary, to achieve the purposes of punishment.

Mr. Harrower does not object to any information in the Final Presentence Investigation Report, ECF No. 25, except to note one small error: Mr. Harrower began work at Dressel Tree Service in Missouri in 2019, not 2000. *See* PSR ¶ 61.

## BACKGROUND

Eric Harrower has now been under community supervision for nine months. During that time, Mr. Harrower has demonstrated that he is without question a person who can succeed on supervision and who will abide by any conditions set by the Court. He has maintained strict compliance with his conditions of release. Mr. Harrower has maintained contact with his pretrial officer; he has focused on employment and his family; and, importantly, he has had no contact with law enforcement. In October 2023, when Mr. Harrower and his family made the decision to move back to Colorado to be closer to elder relatives and a stronger support system in which to raise their four young children, Mr. Harrower was proactive and diligent

about making sure counsel and his pretrial officer were informed and that his move happened with full communication and transparency. His commitment to abiding by his conditions of release demonstrate that Mr. Harrower is already rehabilitated and does not need a term of incarceration or lengthy period of supervision in order to reintegrate into society as a productive citizen—he already has.

Finding himself in a situation that is completely at odds with who he is as a person, Mr. Harrower feels a deep sense of shame and remorse. He is overwhelmingly disappointed for letting down not just himself, but also those who depend on him. He is in the fortunate position to be surrounded by close family members who condemn the events of January 6, 2021, and are a positive influence in Mr. Harrower's life. *See* Exs. 1, 2, Letters in support. While he takes full responsibility for his actions and, in particular, his decision to enter the Capitol building on January 6, 2021, the context in which those decisions were made are important and serve to mitigate the seriousness of Mr. Harrower's offense and reinforce that he will not make a similar mistake again.

In January 2021, Eric Harrower was employed by Joshua Dressel, a former coworker and friend. PSR ¶ 46. Years prior, when Messrs. Harrower and Dressel were employed together doing tree work in Colorado, Mr. Dressel recruited Mr. Harrower to move to Missouri and join Mr. Dressel's new tree repair company as an employee. *Id.* Mr. Harrower and his family moved to Missouri for this job. *Id.* There, Mr. Harrower found himself in what his family considered to be a toxic work environment. *See* Ex. 1, Letter from Rebecca Harrower. Mr. Dressel encouraged Mr. Harrower to

attend the rally on January 6, 2021 with him, and paid for Mr. Harrower's trip. *Id.* Mr. Harrower was hesitant to turn down the invitation, because he feared he may lose his job. *Id.* He was already living far from home, and needed the job to support his young family. Mr. Harrower made the unfortunate decision to travel to Washington, D.C. with Mr. Dressel. They arrived on January 5, 2021. The following day, Mr. Harrower and Mr. Dressel went to the Stop the Steal rally and heard the speech given by President Trump. Then, Mr. Harrower and Mr. Dressel, like many individuals, followed the crowd. Mr. Harrower followed others to the Capitol, eventually entering the building where he remained for about 20 minutes. Mr. Harrower committed no violence, encouraged no violence, committed no vandalism and encouraged no vandalism. After he left the building and left the area, he learned more about the actions of others present that day and the extent of the damage and violence. He was immediately shocked and ashamed of the fact that he was a part of the event on January 6.

Mr. Harrower then took several actions that demonstrate his remorse, rehabilitation, and personal integrity. In the years following January 6, and before he was charged in this case, Mr. Harrower voluntarily made himself known to the FBI as one of the individuals involved in the events of January 6, 2021. PSR ¶ 29. He cut all ties with Mr. Dressel, whom he felt was a bad influence, and got a new job. *See id.* ¶¶ 59-60. Thereafter, he gave a voluntary interview in which he described his and Mr. Dressel's actions that day. *Id.* ¶ 30. Also since January 6, 2021, Mr. Harrower has been fortunate enough to welcome his fourth child, who is now 1 year old. He

moved his family back to Colorado from Missouri, where they are now reunited with extended family who serve as positive influences and role models in Mr. Harrower's life. Eric has been focused on his family, his faith, his job, and continuing to live as a law-abiding and helpful citizen—which he has done throughout his entire 35 years, absent the aberrant behavior he engaged in on January 6.

**ARGUMENT**

### I.      **Legal Standard**

As a Maryland District Court aptly explained, "[t]he sentencing of defendants in federal court is such a common occurrence that it is important to occasionally pause and remember what is at stake. A human life, designed both by nature and our nation's Constitution to live free and pursue happiness, is taken away from family and familiar surroundings to serve days, months, years, or a lifetime in a prison cell." *United States v. Faison*, No. GJH-19-27, 2020 WL 815699, at *1 (D. Md. Feb. 18, 2020). And, "[f]or him, every day, month and year that was added to the ultimate sentence will matter. The difference . . . between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family." *Id.*

This concern exists "whether it is the newly incarcerated individual's first experience with incarceration or just the most recent," because regardless, "he must quickly adapt to the stunning loss of freedom and privacy while struggling to maintain any sense of his personal dignity." *Id.* Thus, the court continued, "it is

crucial that judges give careful consideration to every minute that is added to a defendant's sentence." *Id.*

When imposing a sentence, the Court must consider several factors, including (1) the United States Sentencing Guidelines; (2) the nature and circumstances of the offense; (3) the history and characteristics of the defendant; (4) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct, along with the kinds of sentences available; and (5) the need to avoid unwarranted disparities. *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

*See* 18 U.S.C. § 3582 (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "*sufficient, but not greater than necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

The Court must "make an individualized assessment," considering the factors set forth in § 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007). *Booker* and § 3553(a) require the Court to tailor an individualized sentence that achieves § 3553(a)'s objectives in the case before it. *See Rita v. United States*, 551 U.S. 338, 348, 350 (2007). "'It has been uniform and constant in the federal judicial tradition for the

sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

## II.    <u>The United States Sentencing Guidelines</u>

Mr. Harrower agrees that the U.S. Sentencing Guidelines do not apply to this case because the offense of conviction is a Class B misdemeanor. However, Mr. Harrower asks the Court to consider the policy reasons and justifications behind recent amendments to the U.S. Sentencing Guidelines for zero-point offenders when determining whether any term of incarceration is necessary in this case. Sentencing Commission data analyzing recidivism rates shows that individuals, like Mr. Harrower, with zero criminal history points[1] have considerably lower recidivism rates, including lower recidivism rates than individuals with only one criminal history point. *See* United States Sentencing Commission, *Recidivism of Federal Offenders Released in 2010* (Sept. 2021), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf. The Commission found that just over one-quarter (26.8%) of individuals with zero criminal history points were rearrested. *Id*. at 26. The rearrest rate of zero-point individuals was significantly lower than individuals with just one criminal history point, of which 42.3% were rearrested. *Id*.

---

[1] Mr. Harrower has no prior juvenile or adult convictions—indeed, he has never before been arrested—therefore, had the Sentencing Guidelines applied, he would have zero criminal history points.

The fact that Mr. Harrower has no prior criminal history makes him statistically less likely to reoffend or be rearrested. The low likelihood of rearrest supports a finding that a sentence of probation is sufficient, but not greater than necessary, to satisfy the purposes of punishment including providing adequate deterrence and protecting the public.[2]

The recent amendments to the Sentencing Guidelines also stress the appropriateness of a sentence other than imprisonment "in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." United States Sentencing Commission, *Amendments to the Sentencing Guidelines* at 80 (April 27, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf. The recent amendments add a comment to Guideline § 5C1.1 indicating that a sentence other than imprisonment is "generally appropriate" for first-time offenders or zero-point offenders, who fall into Zone A or B on the sentencing table. Although the Sentencing Guidelines are not applicable to Mr. Harrower's offense, the policy justifications for recommending non-incarceration sentences for first-time or zero-point offenders whose guidelines range does not exceed 15 months (the top of any Zone B range) is equally applicable here. As a first-time offender, who has not committed a crime of violence or otherwise serious

---

[2] The Sentencing Commission report also found that "[f]ewer than one third (29.3%) of offenders sentenced to probation were rearrested[; and o]ffenders sentenced to a probation term of any length had lower rearrest rates compared to offenders sentenced to prison." *Id.* at 36.

offense—who has, in fact, never before been arrested—a sentence of incarceration would be greater than necessary to satisfy the purposes of punishment.

### III.     Imposing a Sentence of Probation is Sufficient, But Not Greater Than Necessary, to Comply with § 3553(a).

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added). Honest application of the federal sentencing statute confirms that a sentence of 12 months' probation with community service and $500 restitution is sufficient but not greater than necessary to meet the goals of sentencing.

#### A.     Mr. Harrower's History and Characteristics

Mr. Harrower is 35 years old. He grew up in Colorado, where he has remained for most of his adult life where he is now raising his family. He and his wife have four children between ages 1 and 11. *See* Ex. 1, Letter from Rebecca Harrower. Mr. Harrower is a committed father and husband who puts his family first. *See* Ex. 1, Letter from Rebecca Harrower ("Eric has been a great husband and father. He helps me by entertaining the kids while I work in the evenings, he changes diapers, gives baths, and reads bedtime stories-with different voices for each character."); Ex. 2, Letter from Karissa Sledd ("Eric is honestly one of the best people I know . . . He is very attentive to his children's and wife's needs. I see him step up and help with the kids – change diapers, give bottles, make plates for the kids, and cook quite often. He works very hard to support his family."). Mr. Harrower is the type of person who would do anything for a community member or extended family member. *See* Ex. 1,

9

Letter from Rebecca Harrower ("Not only has he always been a help to me but he is always ready to help out extended family. He has helped his mom and aunt with yard work and moving furniture. It's not just his family either. A few weeks ago he helped my uncle move some furniture around at his house, he's helped my sister with her kids, and he always makes time to listen, talk to, and sometimes advise my sister and late grandmother."); Ex. 2, Letter from Karissa Sledd ("He has helped me so many times. Specifically, I can recall him changing the oil in my car and bringing me gas . . . Before my grandmother passed away in January, Eric was constantly helping her. He would keep her company and do chores around the house . . . Eric is always willing to lend a hand to anyone who needs it and does not ask for anything in return.").

Mr. Harrower has specialized training and skill with tree maintenance, and has maintained full-time employment in the industry throughout his adult life. *See* PSR ¶¶ 58, 62. Currently, Eric works long hours at his full-time job with Davey Tree Company. *See* PSR ¶¶ 59-60. He started in the Missouri office, and was then granted a transfer to the Boulder, CO office so that he and his family could return home to Colorado to be nearer family and friends. *See id.* His supervisor in the Boulder office, Maxwell Holler, writes that Mr. Harrower "is a valued asset to our team, running crews as a tree care foreman. He arrives at work every day, on time, and ready to work. Eric takes responsibility for himself and others as a foreman. His knowledge and enthusiasm for the tree care industry is exceptional. Eric's willingness to grow and learn in the industry is also an outstanding quality he possesses. Eric is one of our top employees and has a very promising future career here with Davey Tree." *See*

Ex. 3, Letter from Maxwell Holler. Mr. Harrower expects a promotion with Davey Tree and a long future with the company.

As discussed above, Mr. Harrower has no criminal record and the events of January 6 are an aberration in his life and character. He regrets his decision to go to Washington, D.C., to attend the Trump rally, and, most importantly, to enter the U.S. Capitol building. His success on pretrial release demonstrates that he can live a law-abiding life, as he has for his entire life aside from the events of January 6. And, importantly, Mr. Harrower turned himself in and gave the FBI full information about his activities on January 6. Moreover, any period of incarceration would be incredibly burdensome for not only Mr. Harrower but his entire family. Mr. Harrower works long hours, including frequent overtime, and is a committed parent to his four young children. Any imposition of a period of incarceration would take away from Mr. Harrower's ability to provide for and spend time with his family, and is not necessary to serve the purposes of sentencing.

Mr. Harrower's history and characteristics demonstrate that incarceration is not necessary to satisfy the purposes of punishment in this case.

**B.      The nature and circumstances of Mr. Harrower's offense**

After the presidential election, former President Trump, members of his inner circle and some members of the media began circulating the word that the election was "stolen." The false claims spread on media—from local news outlets, to Facebook, to some national broadcasts—that the election had been corrupted.[3]   Like tens of

---

[3] The false claims spread on media—from local news outlets, to social media, to some national broadcasts, that the election had been corrupted.  For example, one news

millions of other Americans, Mr. Harrower was a supporter of President Trump. He was not affiliated with—nor did he support—any extremist organizations and he is opposed to violent action.

Mr. Harrower reluctantly attended the "Stop the Steal" rally in Washington, D.C. at the request of and funded by his boss. *See* Ex. 1, Letter from Rebecca Harrower. Like many others, he had received false information about the 2020 election—information that he now fully recognizes was untrue. When he traveled to the "Stop the Steal" rally, Mr. Harrower intended to protest the election and support Mr. Trump. While the events that unfolded on January 6 have been labeled "an

---

source stated that Texans should be wary of voting by mail in the 2020 election because mail in ballots are "ripe for fraud and abuse." Robert Montoya, *Are Texas Elections Secure?*, Texas Scorecard (Nov. 6, 2020), https://texasscorecard.com/state/are-texas-elections-secure/. *See, e.g.*, Tucker Higgins & Kevin Breuninger, *Texas sues for battleground states in Supreme Court over 'unlawful election results' in 2020 presidential race*, CNBC (Dec. 9, 2020), https://www.cnbc.com/texas-sues-four-battleground-states-in-supreme-court-over-unlawful-election-results.html (reporting on Texas lawsuit filed after the 2020 election which argued that the election results in Pennsylvania, Georgia, Wisconsin, and Michigan . . . should be declared unconstitutional based on the states' use of the COVID pandemic to change their election outcomes); Donald Trump (@realDonaldTrump), *Twitter*, (Dec. 9, 2020, 8:39 AM), https://twitter.com/realDonaldTrump/status/trump-tweets-his-campaign-will-join-paxsons-election-suit (Mr. Trump tweeted in support of the above Texas lawsuit contesting the election results in battleground states, stating that the lawsuit was "very strong, [with] ALL CRITERIA MET. How can you have a presidency when a vast majority think the election was RIGGED?"); Kate McGee, Texas *Republicans decline to condemn President Trump's premature declaration of victory while votes are still being counted*, The Texas Tribune (Nov. 4, 2020), https://www.texastribune.org/texas-republicans-trump/ (reporting how many Texas republicans, including Senator Ted Cruz, Senator John Cornyn, and Governor Greg Abbott, were silent on the matter of "Donald Trump prematurely and falsely [declaring victory]" in the 2020 election and U.S. Rep. Jodey Arrington stating that "there are legitimate concerns regarding the potential for fraud [in the election] that must be addressed in order for the country to move forward").

insurrection," Mr. Harrower did not attend the rally intent on overturning the government. After the rally, Mr. Harrower followed the crowd to the Capitol where he believed they were going to continue to protest.

Mr. Harrower spent approximately 20 minutes inside the Capitol building. The government does not allege—and no evidence would support—that Mr. Harrower participated in any acts of violence, aggression, or destruction. Instead, Mr. Harrower exited the building in an orderly fashion as directed by nearby officers, as is made evident in the CCTV videos.

As referenced above, Mr. Harrower then voluntarily identified himself to the FBI as a person who had been in the Capitol building on January 6, 2021. He gave a voluntary interview with the FBI wherein he detailed his and Mr. Dressel's activities that day. He has consistently displayed remorse for his actions, has a perfect track record on pretrial release, and has not incurred any new arrests or violations of law in the more than three years since the offense conduct.

## C.   The need for the sentence imposed to satisfy the purposes of punishment

A sentence of probation, community service, and restitution is sufficient, but not greater than necessary to satisfy the purposes of punishment. As stated above, Mr. Harrower's status as a first-time offender is significant and a sentence of incarceration is not necessary to deter Mr. Harrower or protect the public from future crimes. Mr. Harrower success on pretrial release and lack of interactions with law enforcement demonstrates that his actions on January 6, 2021 were an aberration and that he has returned to his law-abiding life. And his action turning himself in,

when he may have otherwise not been identified by law enforcement, is a significant display of remorse and personal integrity.

Counsel has also reviewed the recent chart showing sentences to date in January 6 cases. Of those individuals sentenced in 40 U.S.C. § 5104 cases, like Mr. Harrower, the majority have received no term of incarceration. Probationary sentences are appropriate and incarceration is not necessary to satisfy the purposes of punishment in this case.

Additionally, an incarceration sentence is not necessary for specific deterrence. Research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016) (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions"). Mr. Harrower turned himself in, and has had no other contacts with the criminal justice system in his 35 years—specific deterrence is not a concern here.

### D.     The need to avoid unwarranted sentencing disparities

While Mr. Harrower's conduct was serious, probation remains an appropriate resolution as it is well within the guidelines and would not result in disparity. *See*

*e.g., United States v. Russell Dodge*, No. 23-34 (JEB) (9 months' probation with community service); *United States v. David Krauss*, No. 23-34 (JEB) (9 months' supervised release with community service); *United States v. Nicholas Krauss*, No. 22-34 (JEB) (9 months' supervised release with community service); *United States v. William Cotton*, 23-02 (JEB) (9 months' probation with community service); *United States v. Brian Sizer*, No. 22-376 (JEB) (12 months' probation); *United States v. Douglas Farquhar Macrae*, No. 22-181 (JEB) (12 months' probation with community service); *United States v. Gary Edwards*, No. 21-366 (JEB) (12 months' probation with community service and a $2500 fine); *United States v. Andrew Bennett*, No. 21-227 (JEB) (24 months' probation with community service and 3 months' home detention); *United States v. Caleb Jones*, No. 21-321 (JEB) (24 months' probation with community service and 60 days' home detention). *See also, e.g., United States v. Jeffrey Witcher*, No. 21-235 (RC) (12 months' probation with community service); *United States v. Julia Sizer*, No. 21-621 (CRC) (12 months' probation and $2000 fine); *United States v. Andrew Wrigley*, No. 21-42 (ABJ) (18 months' probation with community service and a $2000 fine); *United States v. Jennifer Parks*, No. 21-363 (CJN) (24 months' probation with community service); *United States v. Rachel Pert*, No. 21-139 (TNM) (24 months' probation with community service); *United States v. Esther Schwemmer*, No. 21-364 (DLF) (24 months' probation with community service); *United States v. Andrew Cavanaugh*, No. 21-362 (APM) (24 months' probation with community service); *United States v. Brandon Nelson and Abram Markofski*, No. 21-344 (JDB) (24 months' probation with community service and a

fine); *United States v. Andrew Hatley*, No. 21-98 (TFH) (36 months' probation); *United States v. Valerie Ehrke*, No. 21-97 (PLF) (36 months' probation with community service); *United States v. Anna Morgan-Lloyd*, No. 21-164 (RCL) (36 months' probation with community service); *United States v. Joshua Munn and Kayli Munn*, No. 21-474 (BAH) (36 months' probation with community service); *United States v. Micajah Jackson*, No. 21-484 (RDM) (36 months' probation and a $1000 fine); *United States v. Joseph Zlab*, No 21-389 (RBW) (36 months' probation with community service and a $500 fine).

Comparing Mr. Harrower specifically to some of this Court's prior sentences in January 6 misdemeanor cases evidences that a probationary sentence is appropriate. First, Mr. Harrower actions are comparable to *United States v. Brian Sizer*, No. 22-376 (JEB), who also entered the Capitol building, but committed no acts of violence or destruction therein. Mr. Sizer, like Mr. Harrower, also had no criminal history and he received a sentence of 12 months' probation.

Mr. Harrower is distinguishable from *United States v. Joshua Dressel*, No. 21-572 (CRC). Mr. Dressel also entered a guilty plea to parading and picketing in the Capitol building. The government seeks the exact same sentence for Mr. Harrower that it sought for Mr. Dressel. However, Mr. Harrower, unlike Mr. Dressel, voluntarily turned himself into the FBI. In addition, as detailed above, Mr. Harrower was employed by Mr. Dressel at the time of the January 6, 2021 events, and attended the events in Washington, D.C. at the encouragement of and through the funding of Mr. Dressel. The coercive nature of that employment relationship, Mr. Harrower's

16

voluntary self-identification and interview with the FBI, and his personal characteristics and circumstances distinguish him from Mr. Dressel.

The government also cites *United States v. Caleb Jones*, No. 21-321 (JEB), a case in which this Court fashioned a sentence of 24 months' probation, 2 months of home detention, 100 hours of community service, and restitution. Mr. Jones did not turn himself in voluntarily to the FBI, which Mr. Harrower did. Mr. Jones was also unemployed at the time of sentencing. *See* No. 21-321, Gov't Sentencing Memorandum, ECF No. 23, at 11. And Mr. Jones, who was sentenced in November 2021, did not have the same opportunity as Mr. Harrower has had to prove to this Court that, more than three years after the events of January 6, he has continued to consistently make good decisions, live a productive life, work, and care for his family.

A sentence of 12 months' probation with community service is sufficient, but not greater than necessary, to achieve the purposes of punishment and will not result in unwarranted sentencing disparities.

## <u>CONCLUSION</u>

For the foregoing reasons, and such others as may be presented at the sentencing hearing, Mr. Harrower respectfully requests that the Court impose a sentence of 12 months' probation with community service and $500 restitution.


Respectfully submitted,

A. J. Kramer
Federal Public Defender

*/s/ Kate Adams*

Kate Adams
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500